**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 21-CV-2010

MICHAEL CLARK,

     Plaintiff,

v.

CITY OF IDAHO SPRINGS, a Colorado municipality,
NICHOLAS HANNING, Idaho Springs Police Officer, in his individual capacity,
ELLIE SUMMERS, Idaho Springs Police Officer, in her individual capacity, and
RICHARD SONNENBERG, Idaho Springs Police Corporal, in his individual capacity,

     Defendants.

---

## COMPLAINT AND JURY DEMAND

---

     Plaintiff Michael Clark, by and through his attorney Sarah Schielke of The Life & Liberty Law Office, respectfully alleges for his *Complaint and Jury Demand* as follows:

### I.  INTRODUCTION

1. On May 30, 2021, two Idaho Springs Police officers banged on Mr. Clark's apartment door, stormed into his apartment without warning or warrant, physically assaulted him by kicking him in the leg and punching him in the head, and then – while he stood unarmed and in his boxer shorts 8 feet away from them in his apartment posing no cognizable threat whatsoever – they tased him.

2. Mr. Clark lost consciousness and flew backwards from the tasing, striking his head on a dining room chair on the way down. His head was split open and bleeding. The officers dragged his body into the hallway for all to see. And then they climbed atop his lifeless body, with Officer Hanning putting his knee over and onto Mr. Clark's head and neck, compressing his airway.

1

They handcuffed him on the ground. He laid there, non-responsive, for 2 minutes and 23 seconds.

3.  He was transported to the hospital with his wrists and ankles restrained to the stretcher so that he could not move. At the hospital, Officer Summers falsely informed medical personnel that Mr. Clark had assaulted police with a machete. This information gravely affected Mr. Clark's medical treatment. The hospital kept Mr. Clark overnight to monitor his heart, which was not well due to the tasing causing elevated troponin levels throughout. On Memorial Day, he began vomiting blood. The day after that, he had a stroke.

4.  To deserve this, Mr. Clark had: done nothing. He had broken no laws. Minutes before this occurred, he had been sleeping in his bed.

5.  The Defendants' actions caused Plaintiff Mr. Clark to endure physical injury, pain, suffering, humiliation, extraordinary trauma, emotional distress, loss of independence, loss of enjoyment of life, and other damages.  Mr. Clark enjoyed a rich, happy, independent life prior to this event. On May 30, 2021, that life was recklessly and deliberately obliterated by the Idaho Springs Police Department. Now, 8 weeks later, he remains in a 24-hour complex nursing care facility, awaiting heart surgery. He has yet to go home to his own bed and his 2 beloved cats, Marbles and Gracie. The Defendants stripped him of his independence, his security and his health. He feels deeply sad, betrayed by those who were supposed to protect him. Even if he survives the heart surgery he still now requires, he will never be whole again.

6.  This is an action for damages and other relief against the Defendants pursuant to 42 U.S.C. § 1983 and § 13-21-131, C.R.S. for violations of Plaintiff Mr. Clark's civil constitutional rights to be free of excessive force, unreasonable seizure, and false arrest.

## II.  JURISDICTION AND VENUE

7.  The federal claims in this action arise under the Constitution and laws of the United States and are brought pursuant to 42 U.S.C. § 1983. The state claims in this action arise under the Constitution of the State of Colorado and are brought pursuant to section 13-21-131 of the Colorado Revised Statutes.

8.  Jurisdiction is conferred on this Court pursuant to 28 U.S.C. § 1331 and 1343(a)(3).

9.  Jurisdiction supporting Plaintiff's claim for attorney fees and costs is conferred by 42 U.S.C. § 1988 and § 13-21-131(3), C.R.S.

10. Venue is proper in the District of Colorado pursuant to 28 U.S.C. § 1391(b). All of the events alleged herein occurred within the State of Colorado or were directed at individuals within the State of Colorado.

## III. PARTIES

11. Plaintiff Michael Clark is a citizen of the United States and a resident of the State of Colorado. At the time of the events described in this Complaint, he lived in Idaho Springs, Colorado. As a result of the events described in this Complaint, he is currently residing in a 24-hour care nursing facility in Westminster, CO.

12. Defendant City of Idaho Springs was at all times relevant to this Complaint, a Colorado municipality.

13. Defendant Nicholas Hanning is a natural person, and was at all times relevant to this Complaint duly appointed and sworn as a police officer for the City of Idaho Springs in Idaho Springs, Colorado. At all times relevant hereto Defendant Hanning was acting under color of law, including when his actions were in violation of the Constitution and laws of the State of

Colorado and the Constitution and laws of the United States of America. Officer Hanning is a named Defendant in his individual capacity.

14. Defendant Ellie Summers is a natural person, and was at all times relevant to this Complaint duly appointed and sworn as a police officer for the City of Idaho Springs in Idaho Springs, Colorado. At all times relevant hereto, Defendant Summers was acting under color of law, including when her actions were in violation of the Constitution and laws of the State of Colorado and the Constitution and laws of the United States of America. Officer Summers is a named Defendant in her individual capacity.

15. Defendant Corporal Richard Sonnenberg is a natural person, and was at all times relevant to this Complaint duly appointed and sworn as a corporal officer for the City of Idaho Springs' police department in Idaho Springs, Colorado. At all times relevant hereto, Defendant Sonnenberg was acting under color of law, including when his actions were in violation of the Constitution and laws of the State of Colorado and the Constitution and laws of the United States of America. Corporal Sonnenberg is a named Defendant in his individual capacity.

## IV. FACTUAL ALLEGATIONS

### Michael Clark

16. Mr. Clark is 75 years old. He is a retired railroad worker. He has two adult children and seven grandchildren. They call him "Poppa."

17. Eight years ago, Mr. Clark's wife of thirty years died suddenly of a heart attack. She was his best friend. It was devastating.

18. When his wife passed, it had been decades since Mr. Clark had lived alone. He decided to move to an apartment near his children and grandchildren in Arvada. He lived there, spending lots of time with his family, for several years.

19. Mr. Clark loves the outdoors. He delights in his hobbies of panning for gold, fishing, and camping. He had always dreamed of living in the mountains. Not just near the mountains, but *in* the mountains. Last year, in June of 2020, he decided to make that dream come true. Mr. Clark toured the apartments at Big Horn in Idaho Springs. The apartments were modest, sure, but Mr. Clark lived modestly and required very little in terms of space or amenities. He loved how he could see and hear the creek rolling by from the apartments' back patios. So he packed up his things and loaded up his 2 cats, and moved to a studio apartment at the Big Horn apartments in Idaho Springs.

20. The pandemic had just begun but Mr. Clark, a curious and gregarious man, nevertheless quickly became a beloved character in the neighborhood. He relished in his new life in the mountains, meeting new people, having his children and grandchildren visit, and panning for gold. A 32° Scottish Rite Freemason, devoted to God, country, and service, Mr. Clark transferred to the local masonic lodge in town, eager to build new friendships with good people. He had a perfect routine, each day coming home from his adventures, making himself dinner, fawning attention on his two cats, and then going to sleep. Mr. Clark prized his independence and this rich life he had built around it.

21. Mr. Clark is and always has been, at heart, a worker. He is happiest in motion, contributing to the greater good. In the weeks leading up to May 30, 2021, he had been spending his days volunteering at the masonic lodge, cleaning it up and doing repairs, getting it in shape for meetings to return with the end of the pandemic. Within the 32° Scottish Rite Freemasons, Mr. Clark is also a Knight of Saint Andrew. Knights of Saint Andrew are a service organization, and those who achieve such elevated status within the consistory are solely those who, like Mr. Clark, find their greatest purpose and fulfillment in service to their fellow man.

22. Anyone who knows Mr. Clark also knows that he is a patriot. Although he never served himself, he has always felt great pride, admiration, and respect for the members of our U.S. military. He also made sure to show it. This is why, on May 30, 2021, the day before Memorial Day, Mr. Clark spent his afternoon volunteering at the Fort Lupton National Cemetery. He had walked the grounds, putting individual American flags, one-by-one, on each of the graves of those who so bravely served our country.

23. Mr. Clark came home that evening from the cemetery quite tired. He considered perhaps having a beer or maybe walking over to a friend's, but tomorrow was a big day. Mr. Clark's two adult children, Jeremy and Cynthia, are adopted. And this year's Memorial Day coincided with the anniversary of the day their adoption was finalized. They had thus planned a fantastic Memorial Day together, to be filled with barbecuing, family and celebration. And so, in anticipation of that day, Mr. Clark decided he would just eat his dinner and retire early to some well-deserved rest. He got into bed around 8:30 pm and fell fast asleep.



**Michael Clark on April 4, 2021**

**The Incident**

24. Suddenly, just a couple hours later, Mr. Clark was startled awake. A huge "bang" had just hammered the wall he shared with the adjoining apartment, literally bouncing some of his furniture off of it. He heard an ungodly accompanying racket coming from the other side of

the wall. The apartment had previously been vacant. These new neighbors were not off to a good start.

25. Mr. Clark, no stranger to apartment living, and still groggy with sleep, promptly banged back on the shared wall with his fist, three times. "Keep it down over there!" he yelled. "I'm trying to sleep!"

26. Within seconds, a female on the other side of the wall screamed something unintelligible back (although the word "fuck" sounded like it was in there once or twice). Mr. Clark shook his head, got back under the covers, and went back to sleep.

27. Mr. Clark was then suddenly *again* jolted awake; but this time by the sound of someone knocking loudly and demandingly on his *door*. *Rap-rap-rap-rap-rap-rap-rap*, it went. He sprung out of bed (as quickly as a 75-year-old can spring). Who was it? They did not identify themselves. He assumed it had to be the new neighbors, coming to have a confrontation.

28. Without his glasses, wearing only his boxer shorts, and fearing that whomever was rapping at his door in the middle of the night intended him harm, Mr. Clark grabbed the closest thing to a weapon that he could find in case he should need to defend himself. That item happened to be a collectible sawfish snout sword, made from the bill of a sawfish.


**Mr. Clark's Sawfish Snout Sword**

29. Mr. Clark's late brother-in-law, who was in the Navy, had many, many years before, while stationed in Hawaii, bought the sword at a garage sale. He later gave it to Mr. Clark as a gift. Mr. Clark thought the sword very cool[1] and so he kept it displayed on his bookshelf.

30. Sawfish snout sword in hand, Mr. Clark went to the peephole on his door and looked through. There appeared to be no one on the other side. But then, suddenly, abruptly, and loudly, again, there the knocking went once more. *Rap-rap-rap-rap-rap-rap*. "This is ridiculous," Mr. Clark thought. He assumed it had to be the new neighbors, there to mess with him or pick a fight. They clearly were not going to go away.

31. He unlocked the door and swung it open. As he did so, he asked loudly: "What do you want?"

32. There, stepping into view, were Officer Nicholas Hanning and Officer Ellie Summers of the Idaho Springs Police Department. Both officers were in uniform, Kevlar bulletproof vests and combat boots. They were armed with batons, tasers, and firearms. They also each had their own radio, from which they could call for any manner of assistance - whether it be more information, more manpower, or both.

33. They called for neither. Instead, Officer Hanning, spotting the unusual sawfish snout sword in Mr. Clark's hand, said "What the fuck?" and he stormed towards it.

34. Literally simultaneously, (it was unholstered as the word "the" came out of Hanning's mouth), Officer Summers drew her firearm and pointed it directly at the chest of Mr. Clark. She later told Colorado Bureau of Investigation (CBI) interviewers that she did not actually lay eyes on the sword until several seconds later, when Mr. Clark was putting up on the shelf.  If her

---

[1] Sawfish snout swords are in fact pretty cool. Most coastal museums have at least one in their collections or on display. See, e.g., Kiribati, Sword, Snout of Sawfish (52 x 4.5 cm), Brooklyn Museum, Gift of Appleton Sturgis. Accessible at: https://www.brooklynmuseum.org/opencollection/objects/45756.

statement is true, then by her account, she pointed a gun at Mr. Clark in his home not because he had a sword but simply because he had opened his door.

35. Meanwhile, without uttering a single additional word, Hanning breached the interior of Mr. Clark's home, taking five steps to close the distance within seconds. As he neared Mr. Clark, he leapt out and simultaneously kicked Mr. Clark in his knee using his combat boot and punched Mr. Clark in his head using his flashlight-bearing hand.

36. Mr. Clark stumbled backwards from the blows, further into his own home. "PUT IT DOWN MOTHER FUCKER!" Hanning screamed at him.

37. Somewhat miraculously keeping his composure from all this, and seeing now that it was police at his door, Mr. Clark promptly and visibly disarmed himself. He walked directly back to his bookshelf and put the shark snout sword up on top. He then took three steps away from where he placed it, so that it was observably out of his reach, and faced the police officers who were now again standing now back on the other side of the threshold of his door.

38. Officer Hanning pointed his tactical flashlight directly onto Mr. Clark's person, illuminating the degree to which Mr. Clark was unarmed, unclothed, elderly, and (as opposed to the armed-to-the-teeth pair that was Hanning and Summers), neither interested in, nor capable of, doing them any physical harm.

39. Hanning told Summers to back up (further into the hallway). He did not tell her to put her gun away. He took no issue with her continuing to aggressively point her duty weapon at this helpless man. Officer Summers regularly got her gun out and pointed at innocent citizens. She did so again here.

40. There were now about 6-8 feet between Mr. Clark and the two officers. Mr. Clark stood, planted, about 4 feet inside his apartment. The officers stood about 3 feet back on the other side of the doorway threshold, in the hallway.

41. The hallway was completely empty on either side of the officers, as well as behind them. They had dozens of means of retreat, if they had truly felt threatened by the unarmed, unclothed 75-year-old man standing before them inside his own apartment.

42. They did not retreat. They did not know how to de-escalate or retreat from this situation they had created. They did not possess the training, judgment or experience to do so. They did know one thing though: they were now making a scene and it would be quite embarrassing if this was not promptly resolved with Mr. Clark's complete subjugation and capitulation to their hysterical claims of authority over his person. So they continued.



**Mr. Clark seconds after placing the shark sword atop the shelf several feet back behind him**

43. Officers Hanning and Summers began yelling simultaneous contradictory commands at Mr. Clark. Hanning screamed "GET OUT HERE!!!" and Summers screamed "GET DOWN ON THE GROUND!!" while continuing to point her firearm at him.

44. Despite having just been assaulted by a police officer in his own home, and now being screamed at by those same police, Mr. Clark stayed where he was, and remained calm.

45. Officers Hanning and Summers, on the other hand, did *not* remain calm. Instead, Officers Hanning and Summers became a wild, frenetic, echo chamber of escalation. What happened during the next 30 seconds is so absurd, and so horrific, it really must be seen to be believed.

46. **Plaintiff's Exhibit 1** contains Officer Summers' bodyworn camera (BWC) video of this event, with non-law-enforcement persons' faces blurred by Clear Creek County judge order. **Plaintiff's Exhibit 2** contains Officer Hanning's BWC video of this event, also with the same blurring. These two exhibits have been submitted conventionally via mailed CD and are hereby incorporated by reference. They can also be viewed via the following Dropbox links:

Plaintiff's Exhibit 1 (Summers BWC):

https://www.dropbox.com/s/2yf78wo9rte26a9/EX%201%20Blurred%20Summers%20Bodycam%20Video.mp4?dl=0

Plaintiff's Exhibit 2 (Hanning BWC):

https://www.dropbox.com/s/auwowebjoz0c1u5/Ex%202%20Blurred%20Hanning%20Bodycam%20Video.mp4?dl=0

47. The officers then sprayed Mr. Clark with unlawful, contradictory commands. To illustrate, here is the sequence of commands yelled at Mr. Clark by the officers during the next seven seconds:

| SUMMERS: | Get down! |
| HANNING: | Get out here![2] |
| SUMMERS: | Get down on the ground now! |
| HANNING: | Get down! |
| HANNING: | Get out here, right now! |
| HANNING: | Get out here! |
| SUMMERS: | Get on the ground! |

48. Mr. Clark stayed put. He believed the police were there to referee the wall-banging dispute. He assumed the neighbor had called the police to complain about the single prior occasion on which he had banged on their shared wall and told them to keep it down, and so he expected that this ought to be the part where he was permitted to tell his side of the story.

49. While they sprayed him with their unlawful, contradictory commands, Mr. Clark did in fact attempt to tell his side of the story. He said: "That son of a bitch. I hit that wall, I – "

50. Summers interrupted him, again yelling at him with her gun pointed, "Get on the ground!"

51. Mr. Clark knew he had done nothing wrong. He was inside his own home. He had promptly disarmed himself of his sword despite the pretty clear ongoing threat to his life that these two officers still presented. He was in his underwear. He kept his hands visible. And now they wanted him to order him out of the safety of his home, in his underwear, into the hallway in front of his neighbors? Or onto the ground, who knew which? No. He did not consent to that. So, calmly but firmly, he told them. "No."

---

[2] Should the reader be wondering – the answer is: yes. Officer Hanning did order Mr. Clark to walk *towards* the firearm Summers had pointed at his chest.

52. It is the custom and practice at the Idaho Springs Police Department to treat a citizen's perceived noncompliance (even if only verbal) as a singular event authorizing immediate use of force. This is regardless of other circumstances. If an order is issued, and there is a refusal to comply, the next step is the use of physical force. In addition to this being the ISPD custom and practice, it is also how they are trained to behave.

53. For example, ISPD has a report form that officers use to document their uses of force on citizens. It is called the "Response to Resistance Report." In that form, "VERBAL NON-COMPLIANCE" is listed as one of the boxes that can be checked to describe what resistance justified the force.



54. Here, for Officer Hanning, the box authorizing him to use whatever force he wanted on Mr. Clark, had – literally – now been checked. Nevermind that Mr. Clark was in his own home, unarmed, and presumably still possessing his constitutional rights to not be seized by police without probable cause or a warrant, or subjected to excessive force. Hanning knew how they did things at ISPD. If a subject did not comply with an officer's commands, they were going down.

55. Within a second of Mr. Clark saying "no," you can hear, on the videos, the loosing of the Velcro on the holster for Hanning's Taser as he pulls it out. Hanning pulled it out, and quite deliberately, taking time to aim, pointed its red laser on Mr. Clark's stomach.

56. The red laser of Hanning's Taser was visible on Mr. Clark's stomach to Officer Summers for several seconds. She did nothing to stop Hanning from pulling the trigger.

57. Mr. Clark, completely unaware of what Hanning was about to do to him (he did not have his glasses on), continued his explanation. "They hit that wall so hard, I thought they were going to come through the wall," he said. As he said this, he pointed to the apartment next to him.

58. Then, without command or warning, Officer Hanning fired his Taser into Mr. Clark's exposed abdomen and pelvic area.

59. Mr. Clark, now being electrocuted, was shot backwards by the shock, and fell straight back to the floor, his head striking a dining room chair as he went down.

60. Hanning and Summers then converged into Mr. Clark's apartment. First, they pulled the chair off of Mr. Clark's head. While they do this, you can hear Mr. Clark on the videos gurgling his breaths, struggling to breathe.

61. One would think that perhaps the indignity of this event could not get any worse. But it could, and it did. Next, Officer Hanning next attempted to drag Mr. Clark's body out of his apartment. Rather than do this securely using Mr. Clark's feet, and rather than do this using both of his own hands, Hanning instead kept holding his probing Taser gun in the left hand and used just his own right hand to grab Mr. Clark's limp right wrist, apparently planning to first pull Mr. Clark's lifeless body over itself before dragging it out.

62. Quite foreseeably, this did not go well. In his effort to yank the dead weight of Mr. Clark's entire upper torso over his body using just Mr. Clark's limp arm and wrist, Hanning instead slammed Mr. Clark's bleeding head into the corner of a bookshelf. "Shit," Hanning said, as he did it.

63. Hanning decided to next try dragging Mr. Clark's body out by his feet. Still clutching his Taser gun, Hanning now used both hands to drag Mr. Clark out into the hallway by both his ankles.

64. Removing Mr. Clark from deep inside his apartment and depositing him out in the hallway was the first critical seed of Hanning and Summers' big lie. For, it would be rather hard to explain their tasing of an elderly man if that man's body was found *inside* the threshold of his own apartment.

65. This conspiracy to cover up what they had done to Mr. Clark did not require any conversation; it was common sense. No one could reasonably claim Mr. Clark "came out" with a weapon unless his body was found actually "out." Officer Summers recognized what needed to be done and swiftly endeavored to participate and assist. First, she picked up one of Mr. Clark's lifeless arms and pointlessly held it aloft to aid Hanning in dragging his body out.



**Hanning and Summers drag Mr. Clark's body into the hallway**

66. While the officers dragged Mr. Clark, he continued to make audible gargling sounds indicating difficulty breathing. He remained unconscious.

15

67.  Mr. Clark had been unconscious now for over 30 seconds. Neither officer had yet called for medical assistance.

68. As they dragged him, Officer Summers made her first post-tasing communication to dispatch. It was *not* to request medical assistance. Instead, it was to plant the next seed of hers and Hanning's big lie about Mr. Clark. She said: "207, Taser deployed, **party came out with a machete**."

69. Mr. Clark had not "come out with a machete."

70. Together, the officers then finished dragging Mr. Clark's lifeless body out into the hallway.

71. Now in the hallway, Hanning and Summers next rolled Mr. Clark's body onto his stomach, atop the taser probes still stuck to his skin. Hanning put his knee atop Mr. Clark's neck and leaned in, putting a pressure on Mr. Clark's neck that deprived him of oxygen, prolonged his loss of consciousness, increased his risk of death, and caused an injury to his carotid artery that would days later require carotid artery surgery.



Mr. Clark's head and neck under Hanning's knee

72. Officers Hanning and Summers next put Mr. Clark's limp wrists into handcuffs.

73. **One minute and seven seconds had now elapsed, following the tasing, without either officer yet radioing for medical assistance for Mr. Clark**.

74. Finally, Hanning lifted his knee off Mr. Clark's head and neck, and, after moving his knee into Mr. Clark's back instead, he radioed for an ambulance to respond to the scene.

75. Officer Hanning then stood up and got to one remaining pressing matter: they had moved Mr. Clark's body "out" into the hallway, but if they were going to make their tasering of this elderly man appear to make any sense, the sword Mr. Clark had inside his apartment would need to be "out" in the hallway too. He knew he needed to get it out there quick, in time for medical personnel to see when they arrived.

76. Hanning stood up, marched into Mr. Clark's apartment, retrieved the sword from atop the shelving unit, walked back out into the hallway, past Mr. Clark's lifeless body, and cavalierly dropped the sword out five yards down the hallway. It landed with a thud.

77. Meanwhile, Officer Summers had rolled Mr. Clark onto his side, trying to discern if he was going to regain consciousness. "Sir, sir, sir…..sir, sir…sir….sir…." she said, shaking his shoulder, sounding perhaps just a bit worried, for nearly a minute. As she said this, Hanning, having just finished the sword-planting task and feeling a bit more sure of himself, breezed past them both to go talk to the intoxicated neighbor who had falsely accused Mr. Clark of assault. As Hanning passed Clark on the floor, he remarked to Summers: "He's breathing, he's fine."

78. Mr. Clark was ultimately unconscious for two minutes and twenty-three seconds.

## The investigation

79. What led these two Idaho Springs police officers to Big Horn apartments that night, where they would within 5 minutes of their arrival, tase and nearly kill an unarmed grandfather in his own apartment? It began with a phone call from Mr. Clark's new neighbors.

80. Mr. Clark's new neighbors were Timothy Braden and Brittany Odom. These two individuals are friends who went to high school in South Carolina together. They had both hit on hard times and decided to start their lives anew in Colorado. Mr. Braden had friends in Idaho Springs already, and even had found a job, so the decision was made for them to move there.

81. Ms. Odom was not enthused about moving to Idaho Springs. She was used to living in flashier places like San Diego and Florida.

82. But in her mind,[3] nothing was worse than being alone, so she capitulated to the plan and joined Mr. Braden and his dog in the move to Big Horn apartments.

83. The two spent the day drinking, smoking marijuana, and moving items in. Their dog barked incessantly and it was obvious that the other residents at Big Horn were not feeling too excited about the pair's very noisy arrival.

84. Ms. Odom promptly got herself completely intoxicated. By 10 pm, she was stumbling around and intermittently yelling while rambling. Mr. Braden decided to take the dog and walk over to see some of his friends. He left the drunk Ms. Odom behind in their new apartment, alone. But this was the very thing she had stuck it out with Mr. Braden in the move to Idaho Springs to avoid. She began to stew and fume with frustration that she was in this very unglamorous

---

[3] The allegations in this Complaint related to the thoughts and goings-on of Ms. Odom's mind have good faith factual basis and are not speculation. They are drawn from her intoxicated ramblings describing her experience of this event to police, recorded on Hanning's BWC on May 30 and May 31, 2021.

apartment (she would later say, "I came from Cali, this is not my genre" while gesturing at her surroundings to make clear her dissatisfaction with it) all by herself.

85. Somehow during this drunken alone time, Ms. Odom managed to fall into or otherwise impacted the wall her apartment shared with Mr. Clark's.

86. Mr. Clark, startled awake by the impact and sound, banged three times and yelled through the wall for her to keep it down.

87. This was the final straw for the drunken Ms. Odom. She screamed obscenities through the wall back at Mr. Clark and then began calling Mr. Braden's cell to demand he return. She didn't like it here. And now there were people banging on her walls telling her to be quiet? This place was terrible. How dare Mr. Braden abandon her here. How dare someone bang on her wall like that.

88. Mr. Braden was not eager to return to the intoxicated Brittany Odom, so initially, he did not answer her calls. This was an offense that Ms. Odom was not going to tolerate. If she wasn't important enough for Mr. Braden to stop what he was doing at her beck and call, then she would *make* herself that important.

89. Finally, Mr. Braden returned. She would teach him not to leave her. Ms. Odom, in hysterical tears and sobbing, told Mr. Braden: "That neighbor banged on the wall! He told me to 'shut the fuck up'! And then, he punched me in the face!!"

90. Mr. Braden was horrified. "We have to call the police," he said. Ms. Odom had not anticipated this, but after putting up a small fight (perhaps realizing that if the police came and she told them that Mr. Clark had punched her, that would at least result in him being evicted from the apartments), she permitted Mr. Braden to call 911 to report an assault. He did so.

91. Ms. Odom eventually took over the phone call with 911. Her tall tale about Mr. Clark grew with each iteration. She told them he had punched her in the mouth and face, that there was blood everywhere, and that all she had done to deserve this was politely knock on his door to inquire as to his specific concerns regarding her noise.

92. Dispatch notified the Idaho Springs Police Department, and Officers Nicholas Hanning and Ellie Summers responded immediately. They were there at Ms. Odom's door within 4 minutes of the call.

93. Hanning knocked on Ms. Odom's and Mr. Braden's door, hand hovering excitedly over his firearm. Mr. Braden answered, announced who he was, and further disclaimed that he had not seen any of what Ms. Odom claimed had happened, and so directed them both to talk directly to Ms. Odom for more details. She emerged out of the doorway to talk to them shortly after him.

94. Ms. Odom told the officers the following:

> "He banged on the door, like, or… through the wall, bang bang bang, and – I'm sleeping. 'Shut the fuck up!' And so I like came out, like 'what's….what's going on?' He *(pointing at Mr. Braden)* wasn't here. The dog *(pointing at the dog)* wasn't here."

95. Hanning asked a question: "Ok, and what's he look like?"

96. Ms. Odom ignored it and continued: "I came out and I was like 'What's going on?' Right to the fucking mouth."

97. The rest of this exchange then occurred as follows:

HANNING:      Which room is he in?

ODOM:          I don't know. Right there, possibly?

HANNING:      Ok.

SUMMERS:        What's he look like?

ODOM:           He is an older man. I honestly don't know. When you get knocked the fuck

                out, you don't really…

BRADEN:         We just moved in yesterday.

SUMMERS:        When did this happen?

BRADEN:         Twenty minutes, fifteen…

ODOM:           Not even.

BRADEN:         Yeah, not even. I called like, I walked in the door.

ODOM:           He busted all my shit. My nose, my mouth.

BRADEN:         I was outside.

ODOM:           All I wanted to know was, I was, "Hey, what was disturbing you?" and he

                was like "Shut the fuck up!!" – BOOM *(motions getting punched in the*

                *face)*.

SUMMERS:        Was he white, black, Hispanic?

ODOM:           He's… *(looking up and thinking about it)* white.

SUMMERS:        Does he have hair?

ODOM:           *(Looking up and thinking again)* …Yeah. Gray hair? *(looking to Mr. Braden*

                *for confirmation)*

BRADEN:         Yeah, gray hair. He's an older guy. About this tall.

SUMMERS:        Ok.

BRADEN:         That guy lives right there in that room. And that's where, the wall, yeah-

ODOM:           He was *bang bang bang bang* and that's what woke me up!

BRADEN:         We just moved in here yesterday. But I saw him like… last night or the

night before, or…

98.  That was apparently all these two officers needed. Without a further word, Officer Hanning marched down the hallway to Mr. Clark's door. Officer Summers followed.

99.  Ms. Odom did not have any visible injuries. She pulled down her lower lip at one point to attempt to showcase some redness on the inside of her mouth, however, there were no markings on her body remotely consistent with any kind of punch or hit to the face, particularly one causing loss of consciousness.

100.    There was also not a drop of blood to be seen on Ms. Odom. Her pink long-sleeved shirt was pristine. Her jeans as well. Her face showed no trace of blood, bruising or swelling.

101.    Ms. Odom's repeated demonstrations of the way she had allegedly been hit indicated a strike of considerable force to her face and mouth. Yet there was no physical evidence to be seen which corroborated this fantastical story. Nor did there appear to be any witness to it. Not even – as Ms. Odom took care to point out – the dog.

102.    The total time Officers Hanning and Summers spent investigating Ms. Odom's alleged assault before going to Mr. Clark's apartment door was 95 seconds.

103.    They did not even ask her name, (let alone any other identifying information to see who she was), prior to going to knock on Mr. Clark's door in the middle of the night.

104.    This seems like probably a good time to mention that Officer Hanning was not just a patrol officer at the Idaho Springs Police Department. He was a Detective.



**Hanning's Business Card**

105.   If Officers Hanning and Summers *had* obtained and run Ms. Odom's name and date of birth prior to acting on her allegations, they would have been able to learn the following:

    a.   In December 2016, Ms. Odom was convicted of Fraud in the First Degree for giving a false identity to police officers in Lee County, Florida.



    b.   In October 2012, Ms. Odom was charged with Felony Criminal Domestic Violence of a High and Aggravated Nature in Sumter County, South Carolina.



    c.   In August 2011, Ms. Odom was charged with Felony Criminal Domestic Violence of a High and Aggravated Nature in Sumter County, South Carolina.

23



d. In July 2016, after multiple failures to appear in court, Ms. Odom was convicted of DUI with property damage over .15 BAC.



106. At Mr. Clark's door, Hanning and Summers both stood on either side of the doorway threshold, so that Mr. Clark would not be able to see it was them at the door. They did not announce their presence. This was due to yet another training failure at ISPD. Later, Summers would discuss with Hanning why they didn't announce themselves. Hanning, incomprehensibly, had explained that there were "two schools of thought" regarding whether to announce themselves in that scenario. Summers, having no training or experience to understand or rebut this claim, accepted that explanation.

24

107.    Officer Hanning's reference to "two schools of thought" about announcing their presence may have been referring to how officers serve search warrants on a home. Failures to knock and announce have been responsible for the needless deaths of countless citizens over the past 50 years, leading to a national reckoning in opposition to failures to knock and announce. But again, that relates to the situation where *officers have a warrant*. These officers had no warrant. They were – ostensibly – just supposed to be continuing their investigation of Ms. Odom's already far-fetched sounding claims of assault. There is only one "school of thought" for how that should safely be done, particularly in the middle of the night: By knocking and announcing yourselves as police officers. Otherwise, most people are going to be frightened and likely arm themselves on the way to answer their doors.

108.    This is pretty common sense. However the risk of death or injury if this common sense is not employed is so high that every police department ought to have both policies and trainings for its officers ensuring they follow this practice in the field. Idaho Springs had neither.

109.    In any event, with no announcement whatsoever, Officer Hanning loudly rapped on Mr. Clark's door. And then the events beginning at ¶27, above, began.

**Aftermath**

110.    After 2 minutes and 23 seconds of unconsciousness, Mr. Clark opened his eyes and began trying to take in what was happening. He was in his underwear on the floor of the hallway outside his apartment.

111.    His hands were in handcuffs.

112.    He tried to remember what he had been talking about last. It was the people next door… banging his wall.

113.  Mr. Clark did not look or sound well. His breathing was extremely labored. He rasped and gasped for oxygen.

114.  His words attempted to pick up where he left off at the moment he had been tased. He groaned: "They hit my wall…. They hit my wall so….. They hit my wall so hard…. I…. I…." Officer Summers interrupted him and told him to stay on his side.

115.  "They hit my walls," he said again and again. "They hit my walls."

116.  Blood from the gash on Mr. Clark's head pooled into the carpet on the floor. Officer Hanning returned to engage Mr. Clark again. "Do you remember anything that happened?" he asked.

117.  Mr. Clark, still gasping for air, replied, "There was a big bang on the wall….and it moved my bed a couple feet… and then I pounded on the wall. I told them 'knock it off.' I was doing nothing except sleeping."

118.  In the background, Brittany Odom could be heard screaming and yelling at Mr. Braden, in fact making an extraordinarily disruptive amount of noise. Officer Summers decided she would go and comfort Ms. Odom. She stood up, and told Hanning, "I'll go talk to her." As she walked towards Ms. Odom, she thoughtfully decided to check on Hanning. "Are you okay?" she asked him. Hanning responded, "Yeah."

119.  Officer Summers then went to Ms. Odom. Ms. Odom had collapsed to the floor of her apartment and was sobbing quite dramatically, while clasping Mr. Braden's hands. Summers crouched down and began comforting Ms. Odom, and this exchange took place:

SUMMERS:        I'm here, we are here for you, Ok? What's your name again? What's your name?

ODOM:            Brittany.

| SUMMERS: | Brittany. My name is Ellie, ok? You are okay. You're okay. Right. Are you okay? You are upset. I get that. But are you okay? No? What can I help you with? What can I help you with?" |
| ODOM: | What I want, I know it's totally illegal. But I want to kick the living fuck out of him. |
| SUMMERS: | Okay, well- |
| ODOM: | And I walked away, like a dignified human being. I came in here and I tried calling him (Mr. Braden), and I was like I just got fucking knocked the fuck out. |
| SUMMERS: | You are safe now. You are okay. I know it doesn't like necessarily make it all better, okay, but we are here. |
| ODOM: | I appreciate you. |
| SUMMERS: | I am here for you, Brittany. |

120.    Officer Summers then told Brittany the very same words that Mr. Clark had yelled through the wall at her not too long ago: to "keep it down." This was the third time that one of the officers or Mr. Braden had had to ask Ms. Odom to keep her noise levels down during just the five minutes they had been there.

121.    While Summers was comforting Ms. Odom, Officer Hanning was standing over top of Mr. Clark's body on the floor. Medical personnel were still no where in sight. Mr. Clark continued trying to explain his concern about the wall-banging from the neighbors.

122.    Hanning finally thought it might be a good idea to not just find out Mr. Clark's first name, but to also Mirandize him. He did so. He told Mr. Clark he was under arrest and had the right to remain silent.

123.    Mr. Clark continued, "But officer, I was in there, they hit that wall so hard that I nearly got bounced out of bed. I mean, I don't know what's going on over there but that wall, I mean- "

124.    Hanning interrupted him: "How much have you had to drink?"

125.    Mr. Clark told him: "Nothing."

126.    Hanning conveyed his disbelief. "Nothing?" he said. "You've had nothing to drink?" Mr. Clark told him: "Nothing to drink. You can test me if you want. I'll submit to a test. But these people here… they're the ones that rattled my wall…"

127.    Mr. Clark was later tested for alcohol and drugs at the hospital. All tests came back negative. He had consumed nothing.

128.    Finally, EMTs arrived and began staging around Mr. Clark.

129.    Officer Hanning told the EMTs that Mr. Clark had been tased, and had "got[ten] a kick to the knee" and "a cut on his head."

130.    Officer Summers added, "we did lose consciousness after tasing for a little bit." The EMT inquired "how long?" And Summers responded, incorrectly: "Probably less than a minute."

131.    The EMTs began asking Mr. Clark basic questions related to concussion protocol. While they did so, Officer Hanning went over to where he had placed the sword in the hall and took a photograph of it on his phone.

132.    Mr. Clark asked the EMTs to remove the taser probes still stuck in and protruding from his skin. He was in pain from the probes, the restraints, from the bleeding gash on his head. The EMTs sat him up to attempt to deal with the probes.

133.    Things were not making any sense to Mr. Clark. The force that had been used on him – for what he presumed had been a noise complaint – was absurd, and he had done nothing wrong.

As the EMT sat him up, he asked the question to Summers, pointedly: "What is going *on* here? I have done nothing wrong."

134.   Summers ignored Mr. Clark and did not respond.

135.   Meanwhile, a few other EMTs were trying to talk to Ms. Odom to identify her injuries and treat them. But Ms. Odom had no injuries. So she began yelling at the EMTs. "Why are you questioning *ME*?" she snarled.

136.   The EMTs informed Ms. Odom, again, that they just wanted to check out whatever injuries she had. Ms. Odom spat back at them: "Well, the last time I checked, I was the one that was assaulted, and I don't need these questions!"

137.   An EMT said: "We are just trying to make sure that you are okay." Ms. Odom replied, "I'm fine. I'm fine."

138.   Mr. Braden was extremely embarrassed by how rude Ms. Odom was being to the EMTs. He told her to apologize to them. Ms. Odom said: "I apologize. But I don't want these questions. Please."

139.   Mr. Clark, meanwhile, outside, continued to ask the officers what he had done. Hanning attempted to ignore him, but finally after Mr. Clark asked it for the third time, he responded: "You punched that girl." Mr. Clark was incredulous. "Huh?"

140.   Hanning continued, "You punched that girl and you answered the door with a freaking machete, man." Mr. Clark denied it as a fabrication without any hesitation. "No I didn't," he said. "That is absolutely false."

141.   The EMTs worked to get Mr. Clark back on his feet and onto the stretcher while he was still in handcuff restraints. As they did so, Mr. Clark continued, staring right at Hanning: "I did

not come after nobody. I was just in bed. I attacked nobody. I was just laying in bed. I did nothing."

142.    As he said this, Hanning reached down and picked up the shark mouth sword. He waved it teasingly in front of Mr. Clark's and the EMTs faces. As he did it, he said to Mr. Clark: "Does this look familiar?"

143.    Mr. Clark was confused. Why was his sword out in the hallway? "That was up top there," he said, gesturing with his head towards the inside of his apartment.

144.    Hanning waved it off, quickly, and aggressively. "Just sit. Just sit," he told Mr. Clark. Mr. Clark was in shock. "I didn't come at nobody," he said again. "Sit DOWN!" Hanning snarled at him.

145.    Mr. Clark sat down on the stretcher, in complete disbelief. The girl in the apartment next door had falsely accused him of assault, the police had attacked him without asking a single question, and now here the police were, planting evidence to cover it up and possibly send him to prison, right before his eyes. It was a lot to take in. But Mr. Clark took it in.



Mr. Clark's face, at the moment he realized he was being set up by police and falsely charged with crimes that could send him to prison for the rest of his life

146.   The four EMTs surrounding Mr. Clark began explaining to him that they were going to put

him in hand and foot restraints on the stretcher. Mr. Clark was in complete shock. "This is

really false arrest," he told them. Then, exactly as planned, Hanning and Summers' scene-

staging efforts prior to the EMTs arrival came full circle, as this exchange occurred:

EMT:        I am here because you are injured. I don't care what happened.

CLARK:      Where was I injured?

EMT:        You have a cut on your head. Plus, when they tased you **because you came**

            **outside with that knife**, you lost consciousness. You went unconscious.

CLARK:      What knife?

EMT:        That big knife that he is holding. It looks like a frickin'…. *(Hanning again*

            *dangled the sword)*

CLARK:      Where did you find that? Did you have to hunt for it?

**EMT:**        **It was laying right here on the ground when I walked up.**

CLARK:      I did not get that down.

**HANNING:**   **We're not arguing with you.**

CLARK:      I did not get that down. I did not get that down. It was up top, up there. Did

            you go into my apartment and look for weapons? Did you go into my

            apartment and look for weapons??

**EMT:**        **They don't need to look in your apartment. It was here in the hallway.**

CLARK:      How did it get in the hallway? How did it get in the hallway? I didn't bring

            it out. I didn't bring it out. I did NOT bring that out.

147.   The EMTs wheeled Mr. Clark on the stretcher to the ambulance. Despite having just been

attacked by police officers, assaulted in his own home, and watched the police officers' cover-

up of their misconduct unfold right before him, and now realized as well that they were going to falsely charge him with crimes that could send him to prison for the rest of his life, he maintained his composure and remained respectful to everyone around him.

148.     Hanning later told the EMTs that in addition to tasing Mr. Clark, he had also "kicked him in the knee, and punched him somewhere in the back of the head."

149.     Officer Hanning did not ever inform medical personnel that he had done a chokehold knee restraint on the unconscious Mr. Clark after tasing him. The pressure applied by Hanning's knee and body weight to Mr. Clark's neck caused injury to Mr. Clark's carotid artery, which was already weak due to Mr. Clark's age.

150.     In the 24 hours that followed, Mr. Clark's body began sending blood cells to the injured carotid artery, causing a clot. The next morning, Mr. Clark had a migraine headache. By the afternoon, he was vomiting blood and suffering from extraordinary stomach pain.

151.     Twelve hours after that, Mr. Clark had a stroke.

152.     Eight days later, Mr. Clark required carotid surgery to remove the block caused by the clotted cells.

153.     With Mr. Clark restrained in the ambulance, Hanning and Summers reconvened outside it to confer as to the remaining plan for Mr. Clark.

154.     Officer Summers commented that the formal charging of Mr. Clark with crimes was likely going to have to be a "summons and release type thing," rather than taking him to jail and booking him, because he lost consciousness and so would have to be kept at the hospital for observation.

155.   Officer Hanning didn't agree. He pointed out that they were going to charge Mr. Clark with two felonies ("felony menacing on two police officers," he called it) in addition to the misdemeanor assault charge for Ms. Odom, and so they couldn't do summons and release.

156.   The officers then agreed that Summers would go to the hospital and stay with Mr. Clark to see if he could be discharged in time for her to take him to jail and charge him with the two counts of felony menacing, while Hanning would stay behind and wait for the Victim's Advocate to show up to comfort Ms. Odom.

157.   Both Hanning and Summers agreed aloud that they would charge Mr. Clark with one count of misdemeanor assault and "two counts of felony menacing." Felony menacing in Colorado is a class 5 felony and a conviction carries a 1-3 year prison sentence.

158.   The fluid manner in which Officers Hanning and Summers discussed charging Mr. Clark with felony menacing reveals that they are in fact trained to believe that they could reasonably charge an individual with a crime for holding a sword inside his or her home while answering the door that an unidentified person is pounding on middle of the night. Their conversations about how this charging decision was appropriate reveal that both officers were not properly trained regarding what constitutes such crimes in Colorado, or what basic rights Colorado citizens have.

159.   The officers' reasoning about how they could charge Mr. Clark with felony menacing (naming themselves as the victims) was particularly shocking given that they themselves had just committed Second Degree Assault on Mr. Clark. They had also Tampered with Evidence, committed felony Burglary, and then had literally kidnapped[4] Mr. Clark. Among other crimes.

---

[4] "Any person who knowingly seizes and carries any person from one place to another, without his consent and without lawful justification, commits second degree kidnapping." C.R.S. § 18-3-302(1).

**The tales of Brittany Odom**

160.    The police station's Victim's Advocate soon arrived. Officer Hanning escorted her up to

Ms. Odom in her apartment. Upon arrival, Ms. Odom began recounting the tale of the assault,

but now with many new details and dialogue:

> ODOM:    He banged on this wall while I was laying here. And he banged, 'shut the
> fuck up!' Nothing was going on. So I went around there, and I was like
> "Hey, I'm your neighbor. I just moved in here today. Is everything okay?"
> And he was like "Shut the fuck up." And I was like "I'm *really* not doing
> anything." And – right in the face. Like nose, mouth. Bleeding all over the
> place. I came running back in here to call [Tim]. He didn't answer. So I'm
> sitting here, like, I'm not from here. You know. I came from California.
> Like, I am deserted. And, I don't know. I don't know. And he like tore me
> the fuck apart, because… he creeps, for one. He creeps in the hall, like when
> we were checking this place out. I was looking at the rubber thing or
> whatever and I was like oh that's nice and he was like peeking out the door
> with not his whole face and, yeah. I don't know, I don't know.

161.    Ms. Odom then informed the Victim's Advocate that Mr. Clark had "pulled a gun" on the

police. "He pulled a gun, pulled a gun from what I understand," she explained to the Advocate.

Hanning corrected Ms. Odom that "it was a machete."

162.    Ms. Odom then looped back to telling a new iteration of the tale of her assault:

> ODOM:    I'm sleeping on a fucking air mattress, dead ass asleep, and I hear pound
> pound pound pound over, and I was like "what the fuck?" SO I went around
> there, and I was like "Hey, is everything ok?" And he [Mr. Clark] was like
> "Uh, yeah, yeah, you guys think it's ok?" – like out of his *mind*. I'm not
> dealing with that. I'm not. Listen, I'm the last one. That, fucking literally
> and Tim wasn't even here. I'm calling him over and over and over and over.
> He's over at his friend's house. He finally gets here and I was like I'm
> creeped the fuck out. This dude will not stop banging on the fucking wall.
> I'm literally like, laying in the bath tub to avoid this shit. He was like
> "you're okay, you're okay, I'm going to call the cops." "Don't call the cops,
> don't call the cops. Maybe he's drunk." He was like "no no no no we are
> calling the cops." And sure enough, here you go. He pulls a machete on you
> guys. Okay, really cute. I'm done. I'm done. I don't want to be in this area
> ever.

163. The Victim's Advocate then began to explain the criminal charging process to Ms. Odom. Ms. Odom interrupted the Advocate repeatedly to threaten to kill Mr. Clark.

164. Among many statements of intent to kill or harm Mr. Clark, Ms. Odom said that if Mr. Clark was able to bond out she would "take this into [her] own god-damn hands." She commented that if she "fucking sliced his fucking throat for ever fucking doing something like that to me," she wouldn't be able to bond out. She announced that she "ha[s] a right to carry," and if she saw his face he'd be "done, fool." She said she "would kill" Mr. Clark for what he did and "let me go to prison, I don't even give a fuck." The Advocate told Ms. Odom that Mr. Clark would be able to be released on bond soon and Ms. Odom commented "y'all will see me tomorrow when he comes out." She repeated more than once that she would "make sure he is under, and I mean under."

165. Despite only having moved into the apartment complex that very day, Ms. Odom also during this conversation announced that Mr. Clark "creeps on [her] 24/7" and declared that he was "a pedophile."

166. Officer Hanning was present listening to all of this. He heard Ms. Odom contradict her own story of the assault repeatedly while also making a number of threats on Mr. Clark's life repeatedly. He did nothing to stop the criminal prosecution of Mr. Clark and took no measures whatsoever to protect Mr. Clark from the plainly dangerous and unhinged Ms. Odom.

167. Instead, he asked a follow-up question: "So did he come and knock on your door, or did you go knock on his door when you got hit?"

168. Ms. Odom did not have an easy answer for this. Instead she told the story in a new iteration that had Mr. Braden involved in knocking on doors and holding her back from fighting Mr. Clark:

He was *bang bang banging* and I was like "okay what the hell?" *Bang bang bang*. And then I opened the door and I was like "Tim, is this a joke?" And then he opens his door and I was like "is that you doing that?" And he was like, "shut the fuck up. Shut the fuck up." There was nothing going on. I was asleep. "Shut the fuck up" is what he said. Okay. okay. And so like I walked off, I called Tim, I was like "Yo, your neighbor is being weird. He's being weird. He's been banging on this door." He was like, "wait, what?" I was like, "please get here because I'm fucking scared." And he came here. He heard it. So he goes over there and knocks on the door like "bro what's up? What's up? Like why are you banging on the door?" And he was like, "Y'all are so fucking loud and blah blah," and [Tim] was like, "For one, I haven't even been here." And he was like, "and she's asleep." So then I went to go out and he pushed me back. And then he was like, "Yeah, tell her to shut the fuck up!" I literally was doing nothing. Nothing. Nothing. So and then that's why he said I'm calling the cops. Please don't call the cops. I'm done with this drama. We literally just moved in here today.

169.   Hanning left. The next day, he called Mr. Braden, asking if perhaps Ms. Odom was sober enough to be re-interviewed. Mr. Braden said sure.

170.   Officer Hanning got to Ms. Odom's apartment. She was still utterly intoxicated. She told several new iterations of the story that did not line up with prior ones. She could not tell Hanning whether she was hit with an open or closed hand. She just reiterated that he "knocked [her] out." Despite having previously described in some detail a number of things allegedly uttered by Mr. Clark prior to punching her in the face, she now said that he didn't say anything at all prior to punching her in the face. She said that she "blacked out" from the punch and "woke up on the floor" and that she "crawled back into" the apartment to call Tim, where her "blood was like all over the freaking place," and where she claimed her assailant had then yelled through the wall, "Learn to mind your own fucking business, bitch!"

171.   Brittany Odom has not been charged with any crime.

172.   The 5th Judicial District Attorney's Office and the Idaho Springs Police Department all viewed the videos in which Ms. Clark made this repeated, graphic threats upon Mr. Clark's

life. Neither elected District Attorney Heidi McCollum nor Chief of Police Nathan Buseck ever attempted to inform Mr. Clark that his life had been threatened by this woman residing in his apartment complex or that he should be alert to that threat. Instead, they refused to release the videos containing this critical information to him and his family, for eight weeks, all the while keeping him in the dark about Ms. Odom's openly declared intent to murder him.

173.   To be clear: Had Mr. Clark been released from the hospital during this period, DA McCollum and Chief Buseck, with knowledge from the videos that a resident at his apartment complex had made threats of intent to kill Mr. Clark, **were going to let him return to that apartment complex kept totally in the dark regarding this additional extraordinary risk to his health and safety**.

## At the hospital

174.   Officer Summers accompanied Mr. Clark to the hospital to see if he would have to be admitted or if she could take this 75-year-old man straight to jail like she wanted.

175.   Mr. Clark's initial vitals indicated potential heart complications. The doctors needed to do a few more tests to determine if he had to be admitted. While they did those, Officer Summers decided she would sit herself down in his hospital room and spend the next 70 minutes antagonizing and interrogating him.

176.   Officer Summers told Mr. Clark he was being charged with third degree assault for striking the neighbor, and two counts of felony menacing. Mr. Clark told her he had not struck anybody. Summers "promised to write that down." Mr. Clark asked her to go and find camera from the apartment building. He told her it would show he never came out anywhere.

177.   Mr. Clark questioned the investigation being done about this alleged assault. He reminded Summers that his accuser would "have to ID" him, which he didn't think would be possible,

as he had never seen her before in his life. Summers responded, "well, it's a hell of a coincidence that we get told that this person assaulted this young lady and that that same person came out with a sword or machete."

178.    Mr. Clark responded: "That's a lie. I didn't come out with anything. I didn't come out in the hall with anything."

179.    Summers replied, "okay," quite dismissively. Mr. Clark's waking nightmare continued.

180.    The open head wound on Mr. Clark's face required stitches to close.

181.    While questioning Mr. Clark, Summers asked him where his wife was. Mr. Clark told her that she had been very sick from diabetic retinopathy, requiring that he care for her full time, but that she had passed away suddenly in 2013. Summers told Mr. Clark she was sorry for his loss. Mr. Clark stated: "well, it was a blessing because I have seen nursing homes. I hate nursing homes. **If it comes that I'm in a nursing home, pull the plug. It's not a life. If you can't live life to the fullest**…. I try to serve. I don't try to be served."

182.    Mr. Clark was in and out of the hospital and its ICU with various health crises for a month. At the end of June, he was sent to a 24-hour care complex nursing home facility. Ten days later, his appendix burst and he was sent back to the hospital. He was eventually sent from there to, again, a 24-hour care complex nursing home facility. As of this writing, eight weeks later, Mr. Clark still requires around the clock supervision and care.

183.    After about 75 minutes, a nurse came and informed Officer Summers that the doctors were worried about what they were seeing on Mr. Clark's cardiac monitors, and that he had elevated troponin levels in his heart due to being tased. She advised that he would have to be kept overnight due to these heart complications.

184.    Officer Summers said she was going to leave. Mr. Clark asked if he could go home once the hospital's observation was done. Summers told him to plan on going straight to the Sheriff's Office to turn himself in whenever he was released, as there would be a warrant out for his arrest.

185.    Neither Officer Summers or Officer Hanning attempted to locate a next of kin or contact family for Mr. Clark during their entire contacts with him.

186.    Mr. Clark was never charged with any crime.

## Mr. Clark's Health

187.    The entire day of May 31, Mr. Clark was completely out of sorts and agitated. The fear and anger associated with what Summers and Hanning had done to him had begun to sink in, but things were happening underneath all that with his health as well. He began having terrible stomach pain and saw coffee ground emesis when he used the bathroom.

188.    Mr. Clark's children were finally located and came to his bedside at the hospital. He was like a completely different person they had never seen before. Upset, rude, all over the place, irritable. His cardiac monitors continued to indicate elevated troponins and heart complications from the tasing.

189.    Mr. Clark awoke on June 1 with a migraine headache. The stomach pain continued to get worse and worse. Then he began vomiting blood.

190.    That afternoon, Mr. Clark's daughter went to the bathroom down the hospital hallway. When she returned to Mr. Clark's room, she saw that half of his face had gone limp. He appeared to be having a stroke. She screamed for help. Medical personnel frantically tried to stabilize Mr. Clark and locate the problem. This is what Mr. Clark looked like:



191. Mr. Clark was transferred to the Neuro Intensive Care Unit. He had had a stroke. He continued to have heart complications that worried the doctors. After several days of testing and scans, the doctors concluded Mr. Clark would require heart surgery as soon as he was stable enough to survive such an operation.

192. The hospital stated that Mr. Clark needed to be released into 24-hour skilled nursing facility care. However Officer Summers had told everybody at the hospital on arrival that Mr. Clark had come after two police officers with a machete, which naturally made it into Mr. Clark's medical records. With this allegation in his medical records, no skilled nursing facility would accept Mr. Clark. He had to be released to his daughter instead.

193. Mr. Clark's daughter has six children and a small home. She did not have the capability to provide Mr. Clark with the full-time care that he required. But she did not have a choice. Mr. Clark was sent to her home. He remained in poor health, heavily medicated, totally dependent on others to do anything (including going to the bathroom) and deeply sad.

194.    On June 9, Mr. Clark's blood pressure and heart rate became dangerously unstable. Mr. Clark's daughter rushed him back to the hospital. He required carotid surgery. He spent the next 3 days in the ICU.

195.    On June 11, he moved out of the ICU into a normal hospital room and began working with an occupational therapist and physical therapist to try and regain some of his functioning and independence back. The next day, he was released back to his daughter's home with pages upon pages of instructions regarding the occupational and physical therapy and medications and care he would continue to require at her home.

196.    After just 48 hours at his daughter's home, Mr. Clark was rushed back to the hospital with complications from the carotid surgery. Throughout all of this, Mr. Clark's children were being repeatedly told by Mr. Clark's doctors to prepare for the possibility that Mr. Clark would not survive. The month following the Defendants' attack on Mr. Clark was the darkest, scariest most horrific month Mr. Clark and his children have ever endured.

197.    Mr. Clark spent another two days in the hospital. The hospital wanted him to go to a skilled nursing facility but they could not get him admitted to one. He was released back to his daughter's home. Mr. Clark was in terrible health and shape and his children and grandchildren were positively morose. Everyone labored to get the false allegations about him attacking police officers cleared from his medical records for purposes of obtaining admission for him into a skilled nursing facility.

198.    On June 21, Mr. Clark was again rushed to the hospital by ambulance due to heart complications and his blood pressure dropping to levels as low as 65/40. His heart rate dropped to 40 and his oxygen levels were bottomed out in the 70s. He spent another 2 days at the hospital.

199.    Finally Mr. Clark's children were able to get him accepted for release to a skilled nursing facility. On June 23, he was released to such a facility.

200.    Ten days later, his appendix burst.

201.    Mr. Clark was returned to the hospital for another week.

202.    Mr. Clark was stable enough to be released to 24-hour skilled nursing in mid-July. However, he still requires both heart surgery and surgery to remove his burst appendix. Doctors do not think Mr. Clark's heart is strong enough to survive the surgery to remove his burst appendix; but they also do not want to operate on his heart due to concerns of infection presented by the appendix rupture.

203.    As of this writing Mr. Clark is completely dependent on others for daily functioning. He requires 24-hour supervision and care. He cannot walk more than ten feet without requiring a wheelchair. He will be evaluated for whether he is sufficiently stable to get his needed heart surgery again this week. It remains unknown whether he will ever be healthy enough to live independently, or pan for gold, or camp in the mountains, ever again.

**Officer Hanning**

204.    Officer Hanning began working at Idaho Springs Police Department in October 2017.

205.    Officer Hanning has a history of excessive force incidents spanning his time at ISPD and in the years before, while employed at Park County Sheriff's Department.

206.    Officer Hanning was accused of and investigated for use of excessive force in the Spring of 2013 for an incident in which he had broken the rib of another 70+ year old man. In that case, Hanning had *also* entered the man's home without permission or a warrant. In that case, Hanning had *also* barged in unannounced. In that case, Hanning had *also* barged into an elderly

citizen's home and used force without first having done any investigation into the merits of the original complaint.

207. This 2013 Park County incident was both public record and disclosed to Idaho Spring Police Department before they hired Officer Hanning.

208. Upon information and belief, Hanning had to leave Park County Sheriff's due to the number of complaints made relating to his fitness for duty, reckless uses of force, misrepresentations in written reports, and inability to de-escalate garden variety encounters with citizens.

209. Officer Hanning has poor judgment. It is quite foreseeable that individuals with poor judgment are not good candidates to be police officers, as poor judgment in police work will lead to the needless endangerment of the health and safety of citizens.

210. Idaho Springs Police accepted Hanning knowing all of these things and put him out into field work with no retraining, no supervision, and therefore a reckless disregard for the safety of citizens, particularly the elderly, who might encounter Hanning.

### Officer Summers

211. Summers has been a police officer at Idaho Springs Police Department for just 2 years.

212. During this time Summers has racked up multitudinous complaints. Not just from citizens, but from supervisors too.

213. Almost every single one of the complaints made about Summers relates to her propensity to needlessly escalate, and her categorical inability to ever de-escalate, garden variety police encounters.

214.    Eleven days before training her firearm on Mr. Clark's bare chest in his home, Idaho Springs resident Christine Komatsu complained to Summers' supervisor regarding an incident in which Summer had used excessive force on her and her dogs.

215.    Bodycam from that incident showed Summers responding to a call about barking dogs, and Komatsu asking her if she could let her dogs out because "they're harmless," to which Summers had said "Oh yeah, I don't care."

216.    Once the dogs were out, however, running around their fenced yard barking, Summers pulled out her gun and began aiming it at them. At one point, she even aimed the gun at a dog Komatsu was holding herself. Later in the incident, Summers remarked to Komatsu that she should be grateful, since she (Summers) had "almost shot your dog."

217.    As it happens, when Summers accompanied Mr. Clark into the hospital in this incident, and Mr. Clark was being wheeled in on the stretcher trying to tell anyone who would listen that he was worried about his cats being taken care of and his apartment being looted, Summers remarked to an EMT (right in front of Mr. Clark): "I don't think he realizes that he almost got shot tonight."

218.    Komatsu complained to Idaho Springs Police Department about Summers' excessive force and how instead of being "calm, cool and collected," Summers had "freaked out and pulled her gun" in a garden variety police encounter.

219.    Summers' supervisor, Corporal Sonnenberg, defended Summers to Komatsu and imposed no discipline on Summers for the needless pointing of her firearm at a citizen and her dogs. Chief Nathan Buseck later claimed that a "verbal warning about the department's gun muzzle policy" was given and no record of any internal affairs investigation existed.

220.   In November 2020, another citizen filed a formal complaint of excessive force against Summers, for her assaulting him while he was restrained in handcuffs.

221.   Summers' inability to de-escalate and instead to attack a restrained citizen was so concerning that a corporal who was on scene assisting (Corporal Frost) had to yell at her to stop being so violent with the individual in custody before she actually did so. Corporal Frost then later had to report concerns about Summer's excessive force. As Frost put it: "After we were able to place him in handcuffs, Ellie pulled him back in a really violent manner." Frost expressed concern that Summers' force used "seemed too much for a person in custody."

222.   This November 2020 incident did not result in any discipline or reprimand to Officer Summers. Instead, without any explanation as to why, two other supervisors at Idaho Springs PD (Lieutenant Hanschmidt and former Chief Malanka) deemed Summers "exonerated" of the allegation of excessive force.

223.   On September 17, 2019, Officer Summers was pulled over for speeding on her way to work and received a verbal warning.

224.   Just prior to that, supervisors had given her verbal warnings related to her propensity for "tearing out of" the police department parking lot, driving way too fast.

225.   On October 16, 2019, Officer Summers backed out of the police parking lot too quickly and damaged her patrol vehicle. She received yet another warning for speeding while transporting someone to jail.

226.   Just 11 days after that, Officer Summers "took it upon herself" to respond to a report of an out-of-jurisdiction motor vehicle accident on US Highway 6 and despite extremely poor driving conditions, she sped the whole way there. As she reached the accident site, she could

not slow in time to stop in the slick conditions and had to steer her patrol car into the jersey barrier to avoid hitting the vehicles in the roadway.

227.   Defendant Officer Summers has, to put it bluntly, terrible judgment.

228.   People who have terrible judgment are not good candidates to be police officers.

229.   Defendant Corporal Sonnenberg and Idaho Springs Police Department had knowledge of Defendant Summers' terrible judgment prior to this incident.

230.   Defendant Sonnenberg and Idaho Springs Police Department did not attempt to train Summers to have better judgment or supervise her to ensure she was not endangering the public. Instead they exonerated her from all complaints of excessive force and in so doing, approved of her propensity for excessive force.

## Corporal Richard Sonnenberg

231.   Corporal Richard Sonnenberg was the supervising officer to Officers Hanning and Summers at the time of their attack on and kidnapping of Mr. Clark.

232.   When Corporal Sonnenberg learned about Mr. Clark being in the hospital, he watched Hanning's and Summers' body camera videos to see what happened. Corporal Sonnenberg did not pull Officers Hanning or Summers off duty after watching the videos.

233.   Upon information and belief, Corporal Sonnenberg also approved of the charging decisions being made by his subordinate officers against Mr. Clark.

234.   Upon information and belief, what Officers Hanning and Summers did to Mr. Clark was consistent with the customs and practices at Idaho Springs Police Department regarding use of force. It was also how Corporal Sonnenberg had trained these two subordinate officers to behave.

235.    That same following morning, Mr. Clark's daughter Cynthia went to the Idaho Springs Police Department and spoke to Sonnenberg to request copies of the reports and videos.

236.    Corporal Sonnenberg told her that she would need to "give them a few days" and then she could "fill out a freedom of information act request."

237.    While going through a change in chiefs and leadership in the year leading up to this event (current Chief Buseck was just sworn in at the beginning of April 2021), relatively new hires like Defendant Officers Summers and Hanning required specific training and supervision as it related to use of force, entering the home, how to conduct an investigation, use of firearms, and use of non-lethal force (Tasers, etc.).

238.    Upon information and belief, Corporal Sonnenberg was the direct supervising officer with the duty of providing that training and supervision to Hanning and Summers. Corporal Sonnenberg elected to provide no such training or supervision despite the obvious need (as indicated just by the number of complaints coming in regarding both officers in a short 2-year span).

239.    As it happens, just like Hanning, Corporal Sonnenberg, also came to work at Idaho Springs Police Department after first losing his job as a deputy at Park County Sheriff's Office.

240.    Corporal Sonnenberg in 2012 with two other Park County deputies decided they would break up a lake party by shooting the party's beer keg. Corporal Sonnenberg fired the shot with his duty weapon. He and the other deputies were charged with multiple criminal offenses for this incident and Corporal Sonnenberg ultimately pleaded guilty to one count of Official Misconduct.

241.    Just like Hanning and Summers, Corporal Sonnenberg had a documented history of having poor judgment that resulted in their endangering the health and safety of citizens.

242.    Just like Hanning, this highly publicized demonstration of Sonnenberg's poor judgment – particularly with respect to making determinations in the field of when to use force – somehow did not prevent him from obtaining employment as a police officer at Idaho Springs.

243.    Both Hanning and Sonnenberg were apparently too reckless to be employed as police officers in Park County. Yet they fit right in at Idaho Springs. In fact, at Idaho Springs, they were both regularly promoted due to the department's high turnover and nonexistent leadership or supervision.

**Idaho Springs Policies and Failures to Train, Supervise**

244.    It is the custom and practice at Idaho Springs Police Department that so long as one of the "boxes" is checked with respect to a subject showing any level of noncompliance, that unlimited force can be utilized to gain compliance.

245.    Upon information and belief, Idaho Springs Police officers have received no actual training regarding how to safely interact with elderly citizens. If they had received such basic training, and if they were the type of agency that valued following such training and policies, this event never would have occurred.

246.    The City of Idaho Springs is responsible for effectively training its officers regarding elderly adults and use of force, but failed to do so.

247.    The City of Idaho Springs is responsible for effectively training its officers regarding what is required before officers may converge on a citizen *inside their own home*, but failed to do so.

248.    The City of Idaho Springs states that its officers are trained in de-escalation techniques. In reality, Idaho Springs police officers receive little to no training on how to de-escalate encounters and how to minimize the needless uses of force in citizen encounters.

48

249.   For example, Idaho Springs Police has a policy ("Policy 300") called "Response to Resistance and Use of Force." This policy is 9 pages long and does not actually provide any meaningful guidance to officers regarding how and when the use of force on citizens is appropriate. This policy repetitively states that the amount of force used on citizens should be reasonable and that less force is preferable to more force, while also repeating over and over again that those guidelines may be abandoned if the officer thinks it necessary to do so. For example, the Use of Force policy has the following statements in it:

   a.   "It is also recognized that circumstances may arise in which officers reasonably believe that it would be impractical or ineffective to use any of the tools, weapons or methods provided by this department. Officers may find it more effective or reasonable to improvise their response to rapidly unfolding conditions that they are confronting."

   b.   "While the ultimate objective of every law enforcement encounter is to avoid or minimize injury, nothing in this policy requires an officer to retreat or be exposed to possibly physical injury before applying reasonable force."

   c.   "*Perspective*. When observing or reporting force used by a law enforcement officer, each officer should take into account the totality of the circumstances and the possibility that other law enforcement officers may have additional information regarding the threat posed by the subject."

250.   The defendant officers involved in this incident did not have appropriate training. If they did have appropriate training, their behavior as seen on video demonstrates that they deliberately disregarded that training pursuant to a custom, pattern or practice at Idaho Springs of doing so.

251.   The Idaho Springs Police Department has a pattern and practice of its officers covering up for one another when they are concerned that a particular use of force might look bad. The wordless joint endeavor to move Mr. Clark's body and sword into the hallway following Hanning and Summers' outrageous attack on him is proof of this pattern and practice. For, if it were the first time these two officers undertook such a task, they would have needed to exchange more verbal communication about it.

252.   They have a pattern and practice of disproportionately and needlessly putting escalating encounters with citizens and deploying aggressively disproportionate amounts of force on citizens at the first sign of even mere verbal noncompliance.

253.   Idaho Springs Police Department has a pattern and policy of police brutality, failures to de-escalate, and using excessive force on civilians.

254.   The various videos generated in this case reveal that the City of Idaho Springs customs, patterns and practices (to include one very conspicuous practice of ignoring their own policies) and their lack of adequate and effective training of their officers were the moving forces behind the injuries to Mr. Clark and the violations of his rights.

255.   Plaintiff experienced physical pain, trauma and suffering as a result of the Defendants' unlawful conduct and violations of her civil rights.

256.   Plaintiff also suffered impairment of reputation, personal humiliation, mental anguish, and suffering by virtue of the unlawful actions of these Defendants as set forth herein, for which he is entitled to compensation.

257.   All of the Defendants' actions as described herein were taken under color of state law.

## V.  CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
*42 U.S.C. § 1983 – 4th Amendment Violations – Unreasonable Seizure, Excessive Force*
(against Defendants Hanning and Summers)

258.   Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

259.   When Defendant Hanning suddenly and without warning physically attacked Mr. Clark by – among other things – kicking him, punching him, and pushing him into the wall inside his apartment, as set forth in the paragraphs above, this was an assault upon Mr. Clark's person, employing excessive force, in violation of the Fourth Amendment.

260.   No officer (besides those employed at Idaho Springs) would consider Defendant Hanning's sudden and unannounced deployment of painful force upon Mr. Clark to have been reasonable or justified under the circumstances.

261.   Defendant Summers had both the duty and ample opportunity to intervene to stop Officer Hanning's ongoing violence upon Mr. Clark but chose instead to materially assist Hanning in its continuation by drawing her gun and pointing it at the unarmed Mr. Clark in his own home.

262.   Defendant Summers saw Hanning pull out his Taser to deploy on Mr. Clark, and did not stop him despite opportunity to do so. In fact, she later openly congratulated herself on not having shot Mr. Clark with her firearm during the encounter, revealing her belief that she would have been justified in having done so.

263.   The use of the Taser on Mr. Clark without warning or even remotely ostensible need was excessive and, in the case of an elderly individual like Mr. Clark, carried obvious and known risk of death.

264.  The two officers' climbing atop Mr. Clark's lifeless body to put his hand into restraints was an unreasonable seizure and excessive force in violation of the Fourth Amendment.

265.  Officer Hanning's use of his knee to choke Mr. Clark while Mr. Clark showed no signs of resistance whatsoever was an excessive use of force in violation of the Fourth Amendment, and yet another assault on Mr. Clark's person that Summers had duty and opportunity to intervene to stop.

266.  The Fourth Amendment forbids unreasonable seizures, which includes seizures carried out with excessive force, like this one.

267.  The Defendants unreasonably and unconstitutionally seized Mr. Clark and used excessive force in light of the totality of the circumstances, including but not limited to:

   a.  Mr. Clark posed no physical threat to anyone, anywhere;

   b.  Mr. Clark was unclothed, making the possibility that he had a hidden weapon actually zero;

   c.  Mr. Clark was not attempting to flee nor could he flee, as he was on a second floor apartment and the officers were blocking his only means of exit;

   d.  Mr. Clark had immediately complied with the officers' command to put his sword down, despite their having assaulted him and banged on his door without announcing themselves;

   e.  Mr. Clark's age, size and the likely disabilities associated with his age;

   f.  The officers did not yet have any evidence corroborating the drunk neighbor's claim that Mr. Clark had assaulted her (and most that they had seen so far contradicted the claim) and so did not yet have any reasonable basis to believe that Mr. Clark had committed *any* crimes; and

52

g.  Mr. Clark was in his home, which is afforded additional protections from the entry and trespass of law enforcement, as well as heightened authorizations to carry a weapon in self-defense.

268.  Mr. Clark's right to be free from unreasonable seizure and excessive force as described herein was clearly established at the time the Defendant officers attacked him, tased him, and dragged his body out into the hall.

269.  Defendants Hanning and Summers effected their assaults and injuries to Mr. Clark with deliberate indifference to his rights under the Fourth Amendment to the U.S. Constitution.

270.  Defendants' sudden seizure and violent extended assault upon Mr. Clark caused him to experience great physical pain, injury, and terror. The experience of this event caused and continues to cause Mr. Clark trauma and emotional distress, along with lasting physical injuries which suddenly and abruptly stole from Mr. Clark his most prized possession as an elderly, widowed adult: his independence.

**SECOND CLAIM FOR RELIEF**
*42 U.S.C. § 1983 – Violation of Fourth Amendment – Failure to Train and Supervise*
(against Defendant Sonnenberg)

271.  Plaintiff incorporates all other paragraphs of this Complaint for purposes of this claim.

272.  Defendant Sonnenberg, as Defendant Hanning's and Defendant Summers' immediate supervisor, had a duty to train and supervise them to ensure they were not engaging in conduct that violated the civil rights of citizens like Mr. Clark.

273.  Instead of carrying out this duty, Defendant Sonnenberg condoned such misconduct, provided zero corrective training despite ongoing knowledge of their propensity for such misconduct, and willfully opted out of personally supervising the officers to try and reduce the incidence of such misconduct.

274.   Defendant Hanning's and Summer's use of excessive force and their illegal seizure and assault upon Mr. Clark was the direct result of Defendant Sonnenberg's deliberate indifference to the civil rights of citizens, and his repeated failure and refusal to intervene to supervise, train, or otherwise put a stop to such misconduct.

275.   Defendant Sonnenberg also set in motion the violations of Mr. Clark's rights when he, over the preceding two years, repeatedly condoned and approved of the needlessly escalatory, aggressive type of arrest and use of force conduct deployed by the officers in this case. As a supervisor, Corporal Sonnenberg has read report after report from both officers Hanning and Summers as well as other officers in which it was plain that excessive force had been used, terrible investigations had been conducted, and needlessly reckless courses of conduct and escalations had been pursued and rather than retrain or supervise those officers, Corporal Sonnenberg did nothing, while also attempting to assist his subordinates at Idaho Springs in covering up their violations of citizens' civil rights.

276.   Defendant Sonnenberg's conduct proximately caused injuries, damages, and losses to Mr. Clark.

### THIRD CLAIM FOR RELIEF
*Colo. Rev. Stat. § 13-21-131, Colo. Const. Art. II, Section 7 – Unlawful Seizure*
(against Defendants Hanning and Summers)

277.   Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

278.   The individual Defendants acted under color of state law and within the course and scope of their employment as ISPD police officers at all times relevant to the allegations in this Complaint.

279.    At all relevant times, the individual Defendants were "peace officers" under § 24-31-901(3), C.R.S. and were employed by a local government.

280.    Plaintiff Mr. Clark had a protected interest under the Colorado Constitution, article II, § 7 in being secure in his person from unreasonable seizures by law enforcement personnel.

281.    Officers Hanning and Summers, acting in concert with one another, unreasonably seized and detained Mr. Clark, in violation of the Constitution of the State of Colorado.

282.    Officers Hanning and Summers did not at any time during their encounter with Mr. Clark have probable cause or reasonable suspicion or any other legally valid basis to believe that Mr. Clark had committed, was committing, or was about to commit any violation of law.

283.    Officers Hanning and Summers did not at any time have a warrant authorizing their seizure of Mr. Clark or entry into his apartment.

284.    Officers Hanning and Summers seized and attacked Mr. Clark against his will, despite lacking any legally valid basis for the seizure.

285.    Officers Hanning and Summers violated Mr. Clark's state constitutional rights by engaging in an unlawful seizure of Mr. Clark that was objectively unreasonable in light of the facts and circumstances confronting the Officer Defendants before, during and after their encounter with Mr. Clark.

286.    Officers Hanning and Summers engaged in a joint plan and effort to seize Mr. Clark without probable cause or reasonable suspicion or alternatively, each failed to take reasonable steps to intervene in the other's unlawful seizure of Mr. Clark, despite being in a position and having the opportunity to do so. Each is therefore liable for the damages resulting from the objectively unlawful and unreasonable arrest and seizure of Mr. Clark.

287.    Officer Defendants subjected or caused Mr. Clark to be subjected to the deprivation of individual rights secured by the bill of rights of the Colorado Constitution.

288.    Officer Defendants did not act upon a good faith and reasonable belief that their actions in seizing Plaintiff without probable cause or reasonable suspicion was lawful.

289.    The acts or omissions of the Officer Defendants were the moving force behind, and the proximate cause of, injuries sustained by Mr. Clark.

290.    Defendant Sonnenberg failed to reasonably train and supervise his subordinate officers, including Officer Defendants, in specific issues relating to seizures without probable cause or reasonable suspicion, despite the obvious need to do so.

291.    Defendant Sonnenberg knew that his failure to adequately supervise and train these officers made it reasonably foreseeable that these types of harms would occur.

292.    In failing to reasonably train and supervise ISPD officers, including Officer Defendants, in such issues relating to unlawful seizures, Defendant Sonnenberg caused Mr. Clark to be subjected to the deprivation of his right to be secure in his person against unreasonable seizures as guaranteed by the Colorado Constitution, article II, § 7.

293.    Defendant Sonnenberg's actions and omissions violated Mr. Clark's state constitutional rights and were a substantial and significant contributing cause and proximate cause of Mr. Clark's damages.

294.    Defendant Sonnenberg did not act upon a good faith and reasonable belief that his actions and omissions in failing to adequately train and supervise ISPD officers in this area were lawful.

### THIRD CLAIM FOR RELIEF
*Colo. Rev. Stat. § 13-21-131, Colo. Const. Art. II, Section 7 – Excessive Force*
(against Defendants Hanning, Summers and Sonnenberg)

295.   Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

296.   The individual Defendants acted under color of state law and within the course and scope of their employment as ISPD police officers at all times relevant to the allegations in this Complaint.

297.   At all relevant times, the individual Defendants were "peace officers" under § 24-31-901(3), C.R.S. and were employed by a local government.

298.   Plaintiff Mr. Clark had a protected interest under the Colorado Constitution, article II, § 7 in being secure in his person from excessive force by law enforcement personnel.

299.   Officers Hanning and Summers, acting in concert with one another, employed excessive force on Mr. Clark by means that included but were not limited to, kicking him, punching him, pushing him, pointing guns at him, tasing him, knocking his lifeless head into a bookshelf, dragging him, choking him with unlawful knee restraint, handcuffing him, and detaining him, in violation of the Constitution of the State of Colorado.

300.   Defendants did not have a warrant authorizing their seizure of Mr. Clark or entry into his home.

301.   Officer Defendants had no reasonable basis to believe Mr. Clark posed a threat of harm to the Officer Defendants or anyone else.

302.   The force used against Mr. Clark by Defendant Officers, as described herein, was objectively unreasonable and excessive.

303.   Officer Defendants engaged in a collective plan or effort to use unreasonable and excessive force against Mr. Clark, or alternatively, each Defendant Officer failed to take reasonable steps to intervene in the other Officer Defendant's unlawful use of force against Mr. Clark, despite being in a position and having the opportunity to do so. Each is therefore liable for the damages resulting from the objectively unreasonable and excessive uses of force against Mr. Clark.

304.   Officer Defendants subjected or caused Mr. Clark to be subjected to the deprivation of individual rights secured by the bill of rights of the Colorado Constitution.

305.   Officer Defendants did not act upon a good faith and reasonable belief that their actions in using unreasonable and excessive force against Mr. Clark were lawful.

306.   The acts or omissions of the Officer Defendants were the moving force behind and the proximate cause of injuries sustained by Mr. Clark.

307.   Defendant Sonnenberg failed to reasonably train and supervise ISPD officers, including Officer Defendants, in issues relating to the use of excessive force, de-escalation, the protections of the home, and proper investigations, despite the obvious need to do so.

308.   Defendant Sonnenberg knew or should have known that his failure to adequately supervise and train ISPD officers in such issues relating to unlawful force, the home, investigations, and de-escalation was likely to harm individuals like Mr. Clark; it was reasonably foreseeable that his failures in this area would cause the harm or a similar harm that Mr. Clark has suffered, is suffering and will suffer.

309.   In failing to reasonably train and supervise ISPD officers, including Officer Defendants, in such issues relating to the use of force, Defendant Sonnenberg caused Mr. Clark to be subjected to the deprivation of his right to be free from the use of excessive force by law enforcement officers as guaranteed by the Colorado Constitution, article II, § 7.

310.   Defendant Sonnenberg's actions and omissions violated Mr. Clark's state constitutional rights and were a substantial and significant contributing cause and proximate cause of Mr. Clark's damages.

### FIFTH CLAIM FOR RELIEF
*42 U.S.C. § 1983 – 4th Amendment Violation – Municipal Liability for Unconstitutional Custom/Practice, Failure to Train, Failure to Supervise*
(against Defendant City of Idaho Springs)

311.   Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

312.   All of the acts described herein were done by Defendants Hanning, Summers and Sonnenberg intentionally, knowingly, willfully, wantonly, maliciously, and recklessly in disregard for Mr. Clark's federally protected rights, and they were done pursuant to the pre-existing and ongoing deliberately indifferent customs, policies and practices of the Defendant City of Idaho Springs, under color of state law.

313.   The Idaho Springs Police Department's customs and practices of unlawful conduct (and failures to train/supervise to prevent the same) proximately causing the harms described herein to Mr. Clark include, but are not limited to:

   a.   Idaho Springs' custom and practice of permitting its officers to aggressively and violently arrest any citizen at the first sign of possible noncompliance with any command (regardless of whether that command is actually lawful);

   b.   Idaho Springs' custom and practice of ignoring all its written policies regarding de-escalation, reasonable use of force, appropriate treatment of people who are inside their homes, and conducting responsible investigations into crimes before attempting to arrest people for them;

c.  Idaho Springs' custom and practice of staging the scene of any excessive force incidents by positioning key evidence items in order to make the force that was used appear more justified;

d.  Idaho Springs' custom and practice of refusing to discipline its officers for misconduct and ongoing failures to ever find its officers have caused wrongful harm to citizens, in the face of obvious and repeated constitutional violations, which resulted in a foreseeable culture of police brutality and silence in the face of ongoing and repeated civil rights violations.

314.   The deeply inadequate training and facially defective policies and practices maintained at Idaho Springs PD are amply illustrated in the form that ISPD officers are to fill out every time they employ force on a citizen.

315.   One need only look at the list of broad, open-ended, limitless list of justifications for use of force provided to officers on their "ISPD Response to Resistance Report":



316.   The question those checkboxes are answering is telling in itself – "Reason response was *necessary*." The mere act of filling out their paperwork includes documented proclamation that the force used was necessary.

317.   The unlawful conduct of Defendants Hanning, Summers and Sonnenberg as set forth in detail herein, amounts to a custom and well-settled, widespread overall practice of police brutality deliberately insulated from police accountability, throughout the Idaho Springs Police

Department, even if not authorized by written law or express municipal policy, and is so permanent and well-settled as to constitute a custom or usage with the force of law.

318.     Through the Defendant Idaho Springs' continuous ratification of unconstitutional detentions, arrests, prosecutions, and excessive force, Defendant Idaho Springs has condoned and become the driving force of the Defendants' unconstitutional conduct.

319.     Defendant Idaho Springs knowingly hired police officers with a documented history of poor judgment and improper uses of force, and being aware of the same, still failed to properly train and supervise its officers to avoid their foreseeable use of excessive force, unlawful seizures and abuse of citizens, particularly those who are elderly or otherwise vulnerable to suffering greater harms from such misconduct.

320.     Defendant Idaho Springs' policies, customs and practices in failing to properly train and supervise its employees were the moving force and proximate cause of the violations to Mr. Clark's constitutional rights.

321.     The custom, policy and practice of Defendant City of Idaho Springs of encouraging, condoning, tolerating, and ratifying the unreasonable and excessive use of illegal seizures and excessive force on citizens, as described herein, were the moving force behind and the proximate cause of, the violations to Mr. Clarks constitutional rights.

322.     The acts or omissions of Defendant Idaho Springs caused Mr. Clark to suffer physical and mental pain, among other injuries, damages and losses.

323.     The actions and omissions of Defendant Idaho Springs as described herein deprived Mr. Clark of the rights, privileges, liberties, and immunities secured by the Constitution of the United State of America and caused him other damages.

## SIXTH CLAIM FOR RELIEF
### *42 U.S.C. § 1983 – 14th Amendment - Substantive Due Process Violation*
(against Defendants Hanning and Summers)

324.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

325.    Officer Hanning's and Officer Summers' attack upon Mr. Clark's unclothed, unarmed, elderly person inside his own home was outrageous and conscious shocking.

326.    Officer Hanning's and Officer Summers' joint subsequent effort to drag Mr. Clark's body out into the hallway and move his sword from the interior of his apartment out into the hallway, while Summers radioed that Mr. Clark had "come out with a machete," was also outrageous and conscious shocking.

327.    The fact that the Defendant Officers did all of this while Mr. Clark was unconscious, audibly struggling to breathe, and in his underwear, *while also delaying making any call for medical assistance until the cover-up was first completed*, was further outrageous and conscious shocking.

328.    The baseless and needless attack upon the elderly Mr. Clark in the middle of the night in his own home, in the context of an uncorroborated allegation of assault made by a clearly intoxicated neighbor who had a documented history of violent behavior and lying to police, was so egregious and extraordinary, and so severe, as to amount to brutal and inhumane abuse of official power.

329.    Officer Hanning's audacity in pretending to Mr. Clark that Mr. Clark had put the sword in the hallway, and humiliating Mr. Clark in front of the EMTs while also leading the EMTs to believe Mr. Clark was violent and had been running around the hallways with a sword, was

somehow an even further pinnacle of outrageous, egregious, and callous abuse of official power.

330.    The Defendant officers' openly discussed plan, after inflicting these nearly life-ending atrocities upon Mr. Clark and all their aftermath, to then charge him with felony menacing, further solidifies this claim for relief in its entirety.

331.    The Defendant officers' behavior in this case was conscience-shocking and will repeate and reverberate both trauma and harm into the Idaho Springs community indefinitely until and unless there is extreme and immediate intervention from this Court and the public.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Mr. Clark respectfully requests that this Court enter judgment in her favor and against the Defendants and grant:

a.    Declaratory and injunctive relief, as appropriate;

b.    Compensatory and consequential damages, including damages for emotional distress, humiliation, loss of enjoyment of life, loss of liberty, privacy, sense of security and individual dignity, and other pain and suffering on all claims allowed by law in an amount to be determined at trial;

c.    All economic losses and damages on all claims allowed by law to be established at trial;

d.    Punitive damages on all claims allowed by law and in an amount to be determined at trial;

e.    Issuance of an Order mandating appropriate equitable relief, including, but not limited to:

    a.    Issuance of a formal written apology from each Defendant to Plaintiff;

    b.    The imposition of policy changes designed to avoid future similar misconduct by Defendants;

    c.    Mandatory training designed to prevent future similar misconduct by Defendants;

f.   Attorneys' fees and the costs on all claims allowed by law;

g.   Pre- and post-judgment interest at the lawful rate; and

h.   Any further relief that this Court deems just and proper, and any other relief as allowed by law.

## VII. REQUEST FOR TRIAL BY JURY

Plaintiff requests a trial to a jury on all issues so triable.

Respectfully submitted this 26th day of July, 2021.

THE LIFE & LIBERTY LAW OFFICE

*s/ Sarah Schielke*
Sarah Schielke
Counsel for Plaintiff
The Life & Liberty Law Office LLC
1209 Cleveland Avenue
Loveland, CO 80537
P: (970) 493-1980
F: (970) 797-4008
E: sarah@lifeandlibertylaw.com